**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

**v.**

**Carla Deronda GREGORY et al., Appellees.**

**No. 1131.**

Court of Civil Appeals of Texas, Houston (14th Dist.).

March 26, 1975.

Rehearing Denied April 16, 1975.

Dixie Smith, H. Lee Lewis, Fulbright & Jaworski, Houston, for appellant.

Tom Edwards, Kronzer, Abraham & Watkins, Houston, for appellees.

TUNKS, Chief Justice.

This is a workmen's compensation case.

Carl Albert Gregory was an employee of Dow Chemical Company. Texas Employers' Insurance Association was the compensation carrier for the employer. While on his employer's premises and during his working hours, Gregory fell from the top of a building and received physical injuries from which he died. (By use of the word "fall" herein it is not intended to exclude the possibility that Gregory intentionally jumped from the building.) His daughters, Carla and Sotonya Gregory, filed suit for death benefits and his administratrix sued for funeral expenses. All relevant facts were stipulated except the question as to whether Gregory's death was suicide. The only issue submitted to the jury was the following:

Special Issue No. 1

Was the death of Carl Albert Gregory the result of intentional self-inflicted injury on his part?

Answer "It was the result of intentional self-inflicted injury on his part" or "It was not the result of intentional self-inflicted injury on his part."

There was no objection to such issue.

The jury answered: "It was not the result of intentional self inflicted injury on his part."

After overruling the insurance carrier's motion for judgment n. o. v. the trial court rendered judgment on the verdict and stipulations for the claimants. The carrier's motion for new trial was overruled and it has perfected this appeal.

Appellant's first two points of error raise the "no evidence" and the "insufficient" or "against the weight of the evidence" questions as to the jury's answer to the issue submitted.

On December 10, 1969, Gregory died almost instantly as a result of injuries he

received in the fall from the building. The fall was from the roof of a building in which Gregory normally performed the duties of his employment. The fall occurred around 11:15 a. m. during Gregory's lunch break. The performance of Gregory's duties did not require him to go into the roof of the building.

Joseph H. Andrews, an employee of Tellepsen Construction Company, was doing work near the scene when Gregory fell. He said that he saw Gregory after he left the roof and before he hit the ground. There was a stairway on the side of the building from which Gregory fell. There was a landing on the stairway which was about half way between the ground and the top of the building. The building was forty-three feet high. This stairway and landing extended out about six feet from the side of the building. On one corner of the landing was a light fixture extending upward about three feet from the hand rail. On another corner a pipe extended upward about seven feet. Andrews said that when he first saw Gregory's body falling it was slightly above the stairway landing. It was falling with his feet pointing outward from the building and his head pointing toward the building. It was at about a thirty-degree angle from the horizontal with the head higher than the feet. It maintained that posture until it hit the ground. The body was not tumbling or turning. A pool of blood formed where the head hit the ground. That point measured twenty feet from the edge of the building.

Appellant called as a witness Wiley B. Noble, a mechanical engineer, who qualified as an expert witness. He testified that, applying the laws of physics as to falling objects, the body would have had to be moving horizontally at a speed of 9.15 miles per hour at the time it left the roof in order to land at the point where it fell. The roof was forty-three feet high and the center of Gregory's body was three feet higher. A body will fall forty-six feet in 1.7 seconds. To travel twenty-three feet horizontally during that time (1.7 seconds), the center of Gregory's body had to be moving horizontally at 9.15 miles per hour when it left the roof.

Noble admitted that a body falling straight downward may be propelled horizontally by striking a stationary object on the way down. Pictures taken after the incident show the fixture at the corner of the stairway landing. There were three lights on the fixture. One of the light bulbs in the fixture appears to be broken. Appellees argue that this fact permits the conclusion that Gregory's body struck the light fixture as it fell and was thereby propelled out away from the building to the point at which it fell. They say that this possible conclusion rebuts that of the witness, Noble, to the effect that the body of Gregory was moving horizontally at a speed of 9.15 miles per hour when it left the roof. That argument is unacceptable for several reasons. The body would have had to be propelled outward to strike the light fixture. It is most improbable that the resistance from hitting the light bulb and its breaking would have exerted sufficient force to propel the body outward to such a distance that the head hit thirteen or fourteen feet from the vertical of the light fixture. The eyewitness testified that the body fell without any turning or tumbling motion. The evidence conclusively establishes that Gregory's body was moving horizontally at an appreciable and significant speed when it left the roof.

The roof of the building from which Gregory fell is generally flat. There is, however, a large round tower protruding from the roof. From the nearest edge of the roof to the side of the tower is a distance of five or six feet. Appellees argue that Noble's conclusion as to horizontal speed could not be correct because Gregory could not have attained a speed of nine miles per hour by running the five or six feet between the side of the tower and the edge of the roof. To that side of the tower which would be to the left of one facing the building from the spot where

Gregory hit, there was a distance of about six feet to the edge of the building. It was possible for one to run along this space so as to attain a speed in jumping off the building. Since it was scientifically and mathematically proved that Gregory left the building at a horizontal speed of about nine miles per hour, it may be assumed that he ran along this unencumbered space before jumping.

In Begley v. Prudential Insurance Company of America, 1 N.Y.2d 530, 154 N.Y.S. 2d 866, 136 N.E.2d 839 (1956), the Court considered evidence bearing some similarity to the evidence in this case. That was a case wherein the plaintiff sought to recover under the double indemnity for accidental death provision of an insurance policy. The insured had fallen from a second story window. The insurance company defended on the ground of suicide. In holding against the insurance company, the Court said at page 868 of 154 N.Y.S.2d, at page 841, of 136 N.E.2d:

Other sharply controverted proof was offered to show that the insured was mentally depressed during the weeks immediately preceding his death and that the few feet separating the body from the wall of the building might have been due to horizontal velocity when it left the window, but nowhere was it shown that the deceased did not roll over or crawl after he landed and before he died.

In this case the decedent's head was twenty feet from the building rather than a "few" feet as in the Begley case. Also here the evidence showed that the pool of blood was formed where the head struck the ground and eliminated the possibility that Gregory might have rolled or crawled to that spot after he struck the ground.

There was evidence relevant to Gregory's state of mind. He and his wife of eighteen years were divorced in August 1968. There were two children of the marriage, Carla and Sotonya, the appellees herein. After the divorce the former wife and the two children moved from Freeport, their for-mer home, to Dalhart. Carla was fifteen years old and Sotonya was seven or eight when their father died. There was evidence of mutual affection. Carla testified concerning an event that had occurred about six months before Gregory's death when she and he were visiting at his mother's home in Arkansas. She said that she had awakened crying after dreaming that her father died. He had comforted her, telling her that his own father died when he, Gregory, was a small child and that he was determined that she and Sotonya were going to have a father. There was introduced into evidence a letter dated November 30, 1969, written by Gregory to his daughters discussing his plans for their visit to him during their coming Christmas vacation. There are expressions of affection in the letter. The planned Christmas visit was confirmed by the daughter's testimony. Gregory's next door neighbor testified that he spoke with Gregory the night before he died and that Gregory spoke of the forthcoming Christmas visit with his daughters. The neighbor testified that Gregory seemed happier than he had for a long time and that he had been over a former nervous breakdown for quite a while. The witness also said that Gregory, several days before his death, had bought shingles to re-roof his house and had completed about half of it when he died. Those facts are certainly indicative that at the time of their occurrence Gregory had no intention of taking his life.

A number of Dow employees testified as witnesses for appellant. None of them appeared under subpoena and all admitted that either someone at Dow or appellant's attorney had told them to appear in court to testify. One witness, who had worked in the same area as Gregory for four months preceding his death, testified that the temperature in the work area was 180 degrees and that this could cause a person to act a little erratically at times. However, he stated that during the two weeks prior to his death, Gregory became withdrawn, his temperament was strange, and

the witness tried to avoid him. Another of Gregory's co-workers testified that they had ridden in the same car pool for ten to twelve years and that he considered Gregory as a friend. During the two weeks prior to Gregory's death, the witness noticed that he was withdrawn, did not say much, and was not as friendly as usual. Gregory's supervisor, who had been with Dow for thirty-one years, testified that Gregory had been an excellent worker but that for some period of time preceding his death, he had not been able to perform his tasks without help. The witness noticed that Gregory stopped eating lunch with the other men around the time of his divorce and ate alone in the building instead. He said that Gregory would behave normally one day and then erratically the next, until finally he became irritable and depressed all the time. The witness admitted that some of the men teased Gregory and made fun of him.

Gregory's medical history from the records of John Sealy Hospital, where he was confined in 1968, was admitted into evidence. This history reflected that Gregory's chief complaint at that time was depression and that he had begun to feel that life was not worth living. It was also stated in the history that Gregory had taken an overdose of sleeping pills, but that he said he did not want to kill himself and did not know if he had ever wanted to. The records of Gregory's 1968 confinement in the hospital contain this statement: "The informant states that he tried to kill himself prior to his admission here in 1961. He received electroshock therapy in 1961 as far as the informant can remember."

▆▆▆ The Texas rule of law governing the interpretation of the evidence in this case in deciding the question with which we are presented is stated in Prudential Insurance Company of America v. Krayer, 366 S.W.2d 779, 780 (Tex.Sup.1963), as follows:

There is a legal presumption against suicide; this has been called a "true presumption" which falls or "disappears" when rebutted; that is to say, this presumption once rebutted does not have weight as evidence. Combined American Insurance Co. v. Blanton, 163 Tex. 225, 353 S.W.2d 847. The question in this case is not whether the presumption has been rebutted, but whether it has been conclusively rebutted.

Petitioner has produced circumstantial evidence of suicide which the Court of Civil Appeals characterized as being of "great force". There is no direct evidence of suicide, but the lack of direct evidence does not prevent its being conclusive; an ultimate fact may be conclusively shown by wholly circumstantial evidence. The question is whether reasonable minds might differ as to the inference to be drawn. Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972. "When the only reasonable inference which can be drawn from all the evidence is that death was the result of suicide, the presumption against suicide is [conclusively] rebutted." Combined American Insurance Co. v. Blanton, supra. Thus our inquiry is reduced to whether there was some evidence in the record raising an issue either of accidental death or of homicide, the only other possible hypotheses.

▆▆▆ As stated above, the evidence conclusively establishes that Gregory's body left the roof with horizontal speed. There was no machinery on the roof which could have propelled his body. There was no other person on the roof. No reasonable conclusion can be drawn than that Gregory, himself, provided the force that caused the horizontal speed with which his body left the roof. In keeping with the above quoted authority, we hold that the evidence establishes as a matter of law that Gregory died of injury caused by his wilful intention and attempt to injure himself. His injury was, therefore, not compensable

under the workmen's compensation statute because it was not an "injury sustained in the course of employment." Vernon's Tex.Rev.Civ.Stat.Ann. art. 8309, § 1 (1967).

██ It can be seen from the lone special issue submitted, which is quoted above, that the charge did not affirmatively place the burden of proof on either party. The attorneys in oral argument said that the charge was so submitted by agreement because neither was certain as to which side had the burden of proof. While we are of the opinion that the placing of the burden of proof is not controlling in this case—the insurer legally established suicide even if it had the burden of proof—there are some cases that apparently attach significance to the location of the burden of proof in determining whether suicide is shown as a matter of law. *See* Reserve Life Insurance Co. v. Estate of Shacklett, 412 S.W.2d 920 (Tex.Civ.App.—Tyler 1967, writ ref'd n. r. e.). In this case the burden of proving that the injury from which Gregory died met the statutory definition of "injury sustained in the course of employment", as recited in Article 8309, section 1, rested on the plaintiffs. That definition, stated in negative language, provides that "[t]he term 'injury sustained in the course of employment,' as used in this Act, shall not include . . . [a]n injury caused by the employee's wilful intention and attempt to injure himself . . . ." The same statute excludes other classifications of injuries including those resulting from an act of God, those received while in a state of intoxication, and those inflicted by a third person for reasons personal to the third person. It has been held that the claimant of workmen's compensation benefits has the burden of proof as to those other exclusionary provisions. Liberty Mutual Insurance Company v. Upton, 492 S.W.2d 623 (Tex.Civ.App.—Fort Worth 1973, no writ) (injuries inflicted by third person); Traders & General Ins. Co. v. Ross, 263 S.W.2d 673 (Tex.Civ. App.—Galveston 1953, writ ref'd) (act of

God); Texas Employers Ins. Ass'n v. Monroe, 216 S.W.2d 659 (Tex.Civ.App.— Galveston 1948, writ ref'd n. r. e.) (intoxication). In this case the claimants had the burden of proving that Gregory did not intentionally inflict the injury from which he died. It is true that the legal presumption against suicide was sufficient to discharge that burden in that it established prima facie that Gregory did not intentionally kill himself and shifted to the insurer the burden of introducing evidence sufficient to raise a fact question on the issue or to establish conclusively that Gregory did commit suicide. 1 C. McCormick & R. Ray, Texas Evidence § 53 at 62 (2d ed. 1956). Once the presumption is conclusively rebutted it ceases to be of evidentiary effect and thus does not, of itself, constitute "some evidence" that will preclude a finding of suicide as a matter of law.

██ As a part of their pre-trial discovery procedure, the claimants requested of the insurer admissions of fact under Texas Rules of Civil Procedure, rule 169. One of those requests was worded as follows: "That at the time of his death, Carl Albert Gregory was within the course and scope of his employment for the Dow Chemical Company at its plant A, in Freeport, Brazoria County, Texas, as an operator." The insurer's response to that request was: "Admitted."

The appellees argue that this judicial admission precludes appellant from questioning whether Gregory's death was compensable under the Workmen's Compensation Act. We disagree. In the first place, the record reflects that it has been the insurer's position throughout this case that it denied liability on the sole ground of suicide. All other relevant issues were stipulated by it. There would have been no occasion to try the case if the insurer had admitted that the death was compensable. Thus, it is apparent that it was not the insurer's intent to admit that Gregory's death was compensable. Rather, the record dem-

onstrates that the insurer's counsel was in good faith attempting to simplify and shorten the trial by eliminating those issues not seriously contested.

A literal reading of the insurer's admission does not compel the construction for which appellees contend. Article 8309, section 1 is headed "Words and Phrases Defined." It contains the language: "The term 'injury sustained in the course of employment,' as used in this Act, shall not include: . . . ." Then follow four exclusions: injuries caused by an act of God, injuries caused by third persons for personal reasons, injuries sustained while intoxicated, and intentional self-inflicted injuries. After those exclusions follow these words:

> . . . but shall include all *other* injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere. (emphasis added)

It is quite apparent that one might be acting within the course and scope of his employment under circumstances because of which an injury he sustained would not be compensable because of an exclusion under Article 8309, section 1. For instance, an employee operating a vehicle while intoxicated might be within the course and scope of his employment to the extent that his negligent operation causing someone else's injury would impose liability on his employer. But if he at the same time sustained injuries himself, those injuries would not be compensable under Article 8309, section 1. The insurer's response to the claimants' request for admissions did not constitute a judicial admission that Gregory's death was compensable.

The judgment of the trial court is reversed and judgment is here rendered that the plaintiffs take nothing.